IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ALICIA JADE BROWN,

    Plaintiff,

v.                                                                                                    Civil Action No. **3:13CV599**

**ERIC D. WILSON,** *et al.*,

    Defendants.

## MEMORANDUM OPINION

Alicia Jade Brown, a federal inmate proceeding *pro se* and *in forma pauperis*, filed this *Bivens* action. Brown suffers from Gender Identity Disorder ("GID").[1] Although Brown acknowledges that Defendants[2] have provided some treatment for her GID, including hormone therapy, Brown contends that the treatment provided is inadequate. Specifically, Brown raises the following grounds for relief:

Claim 1    Defendants violated Brown's rights under the Eighth Amendment by:
(a) their refusal to increase Brown's GID-related medications;
(b) their refusal to schedule Brown for an appointment with an endocrinologist;
(c) their refusal to allow Brown to purchase from the commissary items that are sold at women's facilities; and,
(d) their refusal to authorize electrolysis or laser hair removal.

Claim 2    Defendant Vazquez-Velazquez violated Brown's right to equal protection "via his discrimination as to Plaintiff's gender" and "perceived sexual orientation." (Comp. 9.)

---

[1] "GID is a strong and persistent cross-gender identification, which is a desire to be, or insistence that one is, of the other sex." (Compl. 3 (internal quotation marks omitted) (citation omitted).)

[2] Brown names as defendants: Eric D. Wilson, the Warden of the Federal Correctional Institution, in Petersburg, Virginia; Charles L. Samuels, Jr., the Director of the Federal Bureau of Prisons ("BOP"); Dr. Jorge Vazquez-Velazquez, a medical doctor with the BOP; and, Dr. Donald Lewis, the Chief Psychiatrist of the BOP.

Brown requests injunctive, declaratory, and monetary relief.

Defendants have moved for summary judgment. (ECF No. 29.) Brown moved for an extension of time to file a response and has filed a response. Brown Motion's for an Extension of Time (ECF No. 40) will be GRANTED and Brown's Response (ECF No. 41) will be DEEMED TIMELY. For the reasons stated below, Defendants' Motion for Summary Judgment will be GRANTED.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the responsibility of the party seeking summary judgment to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251

2

(citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "'[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the *onus* of proof is imposed.'" *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of their Motion for Summary Judgment, Defendants have submitted, *inter alia*: (1) the declaration of Dr. Vazquez-Velazquez (Mem. Supp. Mot. Summ. J. Ex. 2 ("VV Decl."), ECF No. 30-2), the Declaration of Dr. Lewis (*id.* Ex. 3, ("Lewis Decl."), ECF No. 30-3) and the Declaration of Warden Wilson (*id.* Ex. 4, ("Wilson Decl."), ECF No. 30-4). Brown has responded by submitting an unsworn memorandum of law.[3] (ECF No. 41.)

## II. UNDISPUTED FACTS

### A. Medical Treatment for Brown's GID

On October 25, 2011, Dr. Marykaye Johnson, a psychologist, at FCI Petersburg, diagnosed Brown with GID. (VV Decl. ¶ 5.) Since this diagnosis, Brown has received psychotherapy and has had at least 34 clinical contacts with the psychology staff. (*Id.*)

"On December 2, 2011, medical staff initiated hormone therapy for treatment of Brown's GID. The hormone therapy consisted of an injection of Estradiol Valerate, 20 milligrams, once

---

[3] Brown signed the certificate of service to her Response under penalty of perjury. (Pl.'s Resp. 13.) Brown, however, failed to swear to the contents of the Response under penalty of perjury. Moreover, by Memorandum Order entered July 3, 2014, the Court informed Brown that the Court would not consider as evidence in opposition to any motion for summary judgment a memorandum of law and fact that is sworn to under penalty of perjury. Rather, any verified allegation must be set forth in separate document titled, "Affidavit" or "Sworn Statement."

every four weeks." (*Id.* ¶ 6.) "On January 11, 2012, medical staff evaluated Brown in the chronic care clinic for treatment of both GID and Brown's previously diagnosed seizure disorder. Upon physical examination, there was some enlargement of the breasts." (*Id.* ¶ 8.)

On January 17, 2012, Brown informed medical staff that he wanted to increase the dose of estrogen he was receiving. (*Id.* ¶ 9.) "[M]edical staff consulted with Dr. Lewis, ... who agreed to increase Brown's dosage in a slow taper. Thus, Brown's medication order for Estradiol Valerate was changed from a 20 milligram injection every four weeks, to a 20 milligram injection every two weeks." (*Id.*)

On March 22, 2012, medical staff made further efforts to address Brown's GID. (*Id.* ¶ 10.) On that date, medical staff prescribed "a new medication order for Spironolactone, 25 milligrams daily. Spironolactone is frequently used as a component of hormone replacement therapy in transgender women, usually in addition to estrogen. The clinical response consists of decreased male pattern body hair, breast development, and feminization in general." (*Id.*) On April 17, 2012, medical staff increased the dosage of Spironolactone from 25 milligrams daily, to 37.5 milligrams daily. (*Id.* ¶ 11.)

On September 10, 2012, Dr. Vazquez-Velazquez saw Brown for the first time, reviewed Brown's lab results, and renewed the medication orders for Estradiol Valerate[ ] and Spironolactone. (*Id.* ¶ 12.)

On October 11, 2012, Brown asked to increase his dosage of Spironolactone. (*Id.* ¶ 13.) Because new lab work had just been requested, Dr. Vazquez-Velazquez

> did not increase his dosage at this time as [Dr. Vazquez-Velazquez] thought in [his] professional medical judgment that it was best to wait before increasing the dosage again. [He] also noted [his] concerns with increasing this medication due to Brown's history of high blood pressure and his electrolyte levels. Spironolactone can have adverse drug interactions with blood pressure and other

4

> cardiac medications. Finally, [Dr. Vazquez-Velazquez ] noted that medical staff should follow up on this request after receipt of the most recent lab work.

(*Id.*)

> Thereafter,
>
> On October 17, 2012, Brown again requested an increase in his Spironolactone dosage. The treating doctor increased the Spironolactone dosage from 37.5 milligrams to 50 milligrams daily. On November 15, 2012, medical staff requested a consultation with an endocrinologist for the purpose of determining whether Brown's hormone therapy dosages should be increased.

(*Id.* ¶¶ 15–16.) On November 19, 2012, the Utilization Review Committee disapproved the request "because it was not considered to be medically necessary at that time." (*Id.*)

On December 3, 2012, Brown again requested an increase in his hormone dosage. (*Id.* ¶ 17.) Brown also reported that he recently felt a seizure coming on, but was able to use of controlled breathing to avoid the seizure. (*Id.*) Medical staff declined to increase the hormone dosage at that time. (*Id.*)

On December 11, 2012, Brown met with Dr. Vazquez-Velazquez and a BOP psychologist to discuss the treatment Brown's GID. (*Id.* ¶ 18.)

> After reviewing Brown's current medication and most recent lab results, [Dr. Vazquez-Velazquez] expressed [his] concerns that hormone therapy could interfere with the treatment of Brown's seizure disorder. Brown has been treated for seizures with medication since he entered the BOP. Brown reports he suffered a head injury prior to incarceration and now suffers from seizures as a result. Brown has also been treated for high blood pressure earlier in his BOP incarceration. During this consultation, [Dr. Vazquez-Velazquez] explained to Brown that [he] would not adjust his hormone therapy at this time, but would wait for further guidance on the issue from the BOP Chief Psychiatrist, Dr. Lewis, and the Regional Medical Director.

(*Id.*) Dr. Vazquez-Velazquez denies "ever calling the BOP's policy on GID 'stupid', or discriminating against Brown in any way." (*Id.* ¶ 19.) Dr. Vazquez-Velazquez insists that he "used [his] professional medical judgment by not increasing Brown's dosage of hormone therapy

5

due to Brown's existing seizure disorder and prior medical history of suffering from high blood pressure. [He] did not deny Brown's request to increase the hormone therapy dosage for any other reasons." (*Id.*)

"On March 7, 2013, medical staff evaluated Brown, who requested to lower the dosage of his prescribed seizure medication. Brown reported that he was concerned that an increase in his seizure medication may cause excessive hairiness in areas where ... hair does not normally occur or is minimal on women, such as a beard or chest hair." (*Id.* ¶ 22). The seizure medication was temporarily discontinued. (*Id.*)

On August 29, 2013, the Court received Brown's Complaint asserting, *inter alia*, that Defendants were improperly refusing to increase his medication to treat his GID. (Compl. 1.) On October 8, 2013, pursuant to Brown's request, medical staff increased his dosage of Spironolactone from 50 milligrams daily to 100 milligrams daily. On April 7, 2014, medical staff evaluated Brown for treatment of GID and his seizure disorders, and renewed all medication orders. On August 26, 2014, medical staff evaluated Brown for treatment of GID. Brown requested an additional estrogen pill. After looking at Brown's most recent estrogen and testosterone levels, the doctor declined to make any changes at that time." (*Id.* ¶¶ 24–26.)[4]

---

[4] Brown's lab work indicated

> that his hormones [were] currently at a supratherapeutic level desirable for a patient receiving estrogen for GID. Specifically, the Endocrine Society recommends that testosterone levels be less than 55 ng/dl – Brown's testosterone level was at 24 ng/dl. The Endocrine Society also recommends that estradiol levels generally not exceed 200 pg/ml – Brown's estradiol levels were on the high side at 460.7 pg/ml.

(VV Decl. ¶ 27.)

6

### B. Removal of Brown's Facial Hair

On or about September 15, 2014, Dr. Vazquez-Velazquez received a written recommendation from the psychology department that Brown receive electrolysis. (*Id.* ¶ 28.) Dr. Vazquez-Velazquez promptly consulted with Dr. Lewis, the Chief Psychiatrist for the BOP. (*Id.*) Dr. Lewis informed Dr. Vazquez-Velazquez that electrolysis should be approved on an individual basis, and if medically indicated for that inmate's GID. (Lewis Dec. ¶ 11.)

On September 26, 2014, "the Clinical Director at FCC Petersburg submitted a non-formulary request for Nair for hair removal without shaving. Depending on the results upon using the Nair cream, the request for electrolysis may be revisited." (VV Decl. ¶ 28.) Additionally,

> On September 26, 2014, the Clinical Director also submitted an endocrinology consult given that Brown has now been on hormone therapy for a prolonged period. If approved by the Utilization Review Committee at FCI Petersburg, Brown will be scheduled for an outside appointment with an endocrinologist as FCI Petersburg does not have an endocrinologist that works at the institution.

(*Id.* ¶ 29.)

In "all of the medical and psychological records [at FCI Petersburg] for Brown, . . . there is no mention of suicidal ideations or self-mutilation." (*Id.* ¶ 30.)[5]

### C. Purchase of Female Commissary Items

"FCI Petersburg exclusively houses male inmates. Therefore, FCI Petersburg does not offer inmates the opportunity to purchase female commissary items, such as makeup." (Wilson Decl. ¶ 5.) Warden Wilson concluded that several reasons preclude making an exception for inmate such as Brown to purchase makeup. (*Id.* ¶ 6.) First, he "strive[s] to treat all inmates

---

[5] In the Complaint, Brown alleges that Defendants' refusal to provide her with her desired accommodations for her GID has "led to suicidal ideations and continued thoughts of self-mutilation" or "suicidal ideations and hopelessness." (Compl. 7, 8.)

7

equally. The privileges that Brown requests are contrary to that principle." (*Id.* ¶ 7.) Second, security precludes permitting men to wear makeup. (*Id.* ¶ 8.)

> The first security concern is the potential for disguise and escape. [The] staff needs to be able to recognize the identities of inmates so they know who is an inmate and who is not. For example, every day at lunch, correctional staff at FCI Petersburg verify that inmates match their photographic identification badges. If makeup is present in the prison, inmates can disguise themselves, thereby making it harder for staff to recognize them and making it easier for inmates to escape.

(*Id.* ¶ 9.) Additionally, Warden Wilson is concerned that an inmate wearing makeup is exposed to greater risk of sexual assault. (*Id.* ¶ 10.) In Wilson's "experience, a prisoner who presents him or herself as feminine is at risk for sexual assault." (*Id.* ¶ 11.)[6]

Nevertheless, Wilson has allowed Brown to wear a sports bra. (Wilson Decl. ¶ 14.) Wilson deems this exception to the normal dress code reasonable given that Brown is receiving hormone therapy which causes breast development. (*Id.*)

### III. ANALYSIS

To survive a motion for summary judgment on an Eighth Amendment claim, Brown must demonstrate that Defendants acted with deliberate indifference to his serious medical needs. *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001). A medical need is "serious" if it "'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

The subjective prong of a deliberate indifference claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of

---

[6] "FCI Petersburg medium-security facility administers a sex offender management program, one of the few such programs in the BOP system. FCI Petersburg houses a total of 1,678 inmates. Approximately 817 of these inmates, or 48.6 % of the population at FCI Petersburg, have a current or prior sex offense history . . . ." (Wilson Decl. ¶ 10.)

8

serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (citing *Farmer*, 511 U.S. at 837). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm . . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

In evaluating a prisoner's complaint regarding medical care, the Court is mindful that, "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)); *cf. Estelle v.*

9

*Gamble*, 429 U.S. 97, 104 n.10 (1976) (omission in original) (observing that a "doctor's choosing the 'easier and less efficacious treatment' of throwing away the prisoner's ear and stitching the stump may be attributable to 'deliberate indifference . . . rather than an exercise of professional judgment'" (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974))).[7]

### A. Medications Related to GID

In Claim 1(a), Brown contends that Defendants acted with deliberate indifference to the need to increase the dosage of Spironolactone and Estradiol to treat Brown's GID. The record flatly refutes this contention. The record reflects Defendants have steadily increased these medications to treat Brown's GID over the course of Brown's incarceration. Brown's disagreement with respect to the decisions of medical professionals as to the appropriate dosage for these medications fails to demonstrate deliberate indifference. *Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6).[8] Claim 1(a) will be DISMISSED.

---

[7] Throughout her Response to the Motion for Summary Judgment, Brown contends that Defendants' refusal to strictly adhere to "the World Professional Association for Transgender Health ('WPATH') Standards of Care" constitutes deliberate indifference. (Pl.'s Resp. 3–5.) Brown's conclusory statements in her response to the Motion for Summary Judgment fail to indicate she is competent to testify as to the appropriate standard of care for GID. *See Hogge v. Stephens*, No. 3:09CV582, 2011 WL 2161100, at *6 (E.D. Va. June 1, 2011) (observing that "a prisoner 'wholly lacking in medical knowledge' may not give expert medical testimony" (quoting *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001))).

[8] The Court acknowledges that "just because [Defendants] have provided [Brown] with *some* treatment consistent with [appropriate treatment for her] GID . . . , it does not follow that they have necessarily provided her with *constitutionally adequate* treatment." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (citing *De'lonta v. Angelone*, 330 F.3d 630, 635–36 (4th Cir. 2003); *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010)). The record here, however, fails to demonstrate that Defendants' course of treatment continued to expose Brown to any substantial risk of serious harm. *See De'Lonta*, 330 F.3d at 635–36 (reversing dismissal for failure to state a claim, where although the defendants had provided some treatment, the record failed to demonstrate that she had "received constitutionally adequate treatment to protect her from her compulsion to mutilate herself").

### B. Consultation with an Endocrinologist

In Claim 1(b), Brown contends that Defendants acted with deliberate indifference by failing to arrange an appointment with an endocrinologist. Brown fails to direct the Court to any evidence that suggests the lack of such a consultation exposes Brown to a substantial risk of serious harm. Moreover, absent exceptional circumstances which are not present here, the medical decision of whether to refer an inmate to a specialist, generally fails to provide a basis for demonstrating deliberate indifference. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) ("Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing." (citing *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992))). Accordingly, as Brown fails to demonstrate deliberate indifference, Claim 1(b) will be DISMISSED.

### C. Female Commissary Items

In Claim 1(c), Brown contends that Defendants have subjected her to cruel and unusual punishment by failing to allow her "to purchase commissary products appropriate for assisting her in her transition to a female gender, *i.e.*, facial makeup, clothing, and other items." (Compl. 10.) Brown, however, fails to direct the Court to any evidence that demonstrates she faces a substantial risk of serious harm in the absence of these items. Moreover, the record reflects that Defendant Wilson declined to provide Brown with these items because he reasonably perceived that use of makeup and feminine clothing may place Brown at a greater risk of sexual assault. Because Brown fails to demonstrate that Defendants acted with deliberate indifference, Claim 1(c) will be DISMISSED.

### D.     Removal of Facial Hair

In Claim 1(d), Brown asserts that Defendants' failure to provide electrolysis amounted to cruel and unusual punishment. Defendants, however, did not ignore Brown's concerns about her facial hair, they provided Brown with Nair to remove the facial hair and are open to revisiting the request for electrolysis if the Nair proves ineffective. While Brown may have preferred electrolysis to Nair, an inmate with GID "does not enjoy a constitutional right to the treatment of his or her choice." *De'lonta*, 708 F.3d at 526. Brown fails to demonstrate that the provision of Nair, instead of electrolysis, poses a substantial risk of serious harm to Brown's person. Accordingly, Claim 1(d) will be DISMISSED because Brown fails to demonstrate that Defendants acted with deliberate indifference.

### E.     Alleged Denial of Equal Protection

In Claim 2, Brown contends that Defendant Vazquez-Velazquez violated Brown's right to equal protection "via his discrimination as to Plaintiff's perceived gender" and "perceived sexual orientation." (Comp. 9.) "The [Equal Protection] Clause requires that similarly-situated individuals be treated alike." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). "In order to make out a claim under the Equal Protection Clause, a plaintiff must demonstrate that he has been treated differently from others similarly situated and that the unequal treatment was the result of intentional discrimination." *North v. Clarke*, No. 3:11-CV-211, 2011 WL 3321482, at *6 (E.D.Va. Aug. 2, 2011) (citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). To succeed on an equal protection claim, a plaintiff must set forth "specific, non-conclusory factual allegations that establish improper motive." *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003) (internal quotation marks omitted) (citation omitted). Brown fails to advance any

13

evidence that she has been treated differently than similarly situated individuals or that any unequal treatment was the result of intentional discrimination. Accordingly, Claim 2 will be DISMISSED.

## IV. CONCLUSION

Defendants' Motion for Summary Judgment (ECF No. 29) will be GRANTED. Defendants' Motion to Dismiss (ECF No. 28) will be DENIED AS MOOT. The action will be DISMISSED.

An appropriate Order will accompany this Memorandum Opinion.

/s/ JG Jr.
John A. Gibney, Jr.
United States District Judge

Date: 6/23/15
Richmond, Virginia